**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON**

**CIVIL ACTION NO. 2:17-CV-114 (WOB-CJS)**

**VONDERHAAR**                                                                 **PLAINTIFF**

**VS.**                          **AMENDED MEMORANDUM OPINION AND ORDER**

**AT&T MOBILITY SERVICES, LLC ET AL.**                          **DEFENDANT**

Lawsuits under the Family Medical Leave Act ("FMLA") typically involve the denial of FMLA leave time. This unusual employment case, however, arises from Plaintiff Kristina Vonderhaar's allegations that she was *forced* to take FMLA leave after reporting that her co-workers were making unauthorized changes to customer accounts. Shortly after returning to work, Plaintiff alleges she was mistreated. As a result, she voluntarily resigned and brought this lawsuit nearly two years later, asserting the following eight (8) counts:

**Count I:**       Interference with Rights Under the FMLA, 29 U.S.C. § 2615(a)(1)

**Count II:**      Retaliation for Exercising FMLA Rights, 29 U.S.C. § 2615(a)(2)

**Count III:**     Intentional Infliction of Emotional Distress ("IIED")

**Count IV:**     Negligent Infliction of Emotional Distress ("NIED")

**Count V:**      Negligence/Vicarious Liability

**Count VI:**     Wrongful Termination Based Upon Constructive Discharge

**Count VII:**    Punitive Damages

*Vonderhaar v. AT&T Mobility Servs., LLC* et al.

**Count VIII:**    Causation and Damages

This matter is now before the Court on Defendants' motion for summary judgment (Doc. 36). The Court previously heard oral argument on Defendants' motion and took the matter under submission. (Doc. 48).

After further consideration, the Court now issues the following Memorandum Opinion and Order.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Alleged Misconduct in the Workplace

Defendant AT&T Mobility Services, LLC ("AT&T") hired Vonderhaar on September 15, 2013. (Doc. 36-4, ¶ 3). Throughout her employment with AT&T, Vonderhaar worked as a Retail Sales Consultant at the Maysville, Kentucky location. *Id.*; (Doc. 1-1, ¶ 6). There, Vonderhaar reported to Jessica Webb, the store manager, until sometime in 2014 when Fred Hoskins took over as store manager. (Doc. 38-5, Pl.'s Dep. 31–32). The store managers reported to Amy Waymire, the area retail sales manager. *Id.* at 30–32.

In 2014 and 2015, employee requests for FMLA leave time were processed by AT&T's FMLA Operations team located in San Antonio, Texas. (Doc. 36-6, ¶¶ 4–5). This team was tasked with determining whether to approve or deny FMLA leave and would notify both the employee and their supervisor of the decision via e-mail. (Doc. 35-8 at 46–48). Significantly, an employee's supervisor or manager does not have access to medical documentation; nor do they have any input into the decision to approve or deny a request for FMLA leave. (Doc. 36-6, ¶ 9).

*Vonderhaar v. AT&T Mobility Servs., LLC* et al.

2

In November and December of 2014, Vonderhaar underwent multiple hysterectomy surgeries. (Doc 38-5 at 44–45). Around this same time, the FMLA Operations team received a certification from Vonderhaar's health care provider regarding the surgery. (Doc. 36-6, ¶ 11). The medical certification stated that intermittent leave was medically necessary for two days per week. (Doc. 36-6, Ex. 1). In due course, the FMLA Operations team approved Vonderhaar's FMLA request. *Id.* at ¶ 12. She then took continuous FMLA leave from November 24, 2014 to February 2, 2015. *Id.* at ¶ 13; (Doc. 38-5 at 115); (Doc. 1-1, ¶ 9). When Vonderhaar returned, she resumed working in her same previous position, performed her usual duties, and earned the same salary. (Doc. 38-5 at 115); (Doc. 36-5, ¶ 8).

Vonderhaar testified that sometime near the end of 2014 or early 2015, AT&T's management informed employees of a change in policy, which was that going forward, adding temporary phone lines to customer accounts without authorization was prohibited. (Doc. 38-5 at 60, 68). Notwithstanding the policy change, in February 2015 Vonderhaar alleges her co-workers added unauthorized temporary phone numbers to customer accounts. (Doc. 38-5 at 60–61); (Doc. 1-1, ¶ 10).[1] According to Vonderhaar, she informed the assistant store managers, Hannah Eves and Tabitha Everman, that employees were making unauthorized changes to customer accounts. (Doc. 38-5 at 65–66). Vonderhaar, however, did not report the alleged misconduct to Waymire, AT&T's Ethics Hotline, or any public entity.

---

[1] Specifically, Vonderhaar testified that one co-worker confided in her that he was going to add a temporary phone number to a customer's account so that he could meet his sales numbers. (Doc. 38-5 at 64). But Vonderhaar admits she never witnessed the transaction. *Id.*

(Doc. 38-5 at 65, 67, 69).

Roughly a month later, on March 6, 2015, the FMLA Operations team received a second medical certification from Vonderhaar's health care provider, signed March 2, 2015, indicating that Vonderhaar suffered from heart palpitations and was incapacitated from February 19, 2015 to March 13, 2015. (Doc. 36-6, Ex. 2); *see id.* at ¶ 14. This certification, however, stated that intermittent leave was not medically necessary. (Doc. 36-6, Ex. 2). Nonetheless, the FMLA Operations team approved Vonderhaar for intermittent FMLA leave on nine (9) dates.[2]

On or about April 8, 2015, Vonderhaar verbally reported to Eaves that a co-worker had added an extra line to an existing customer's account by signing a two-year contract without the customer being present at the store. (Doc. 1-1, ¶ 11); (Doc. 38-5 at 57–58). Contrary to company policy, the transaction took place over the phone. (Doc. 38-13 at 11). On April 8, 2015, after her conversation with Eaves, Vonderhaar utilized AT&T's anonymous, third-party operated Ethics Hotline to report the incident. (Doc. 38-5 at 74–75); (Doc. 36-4, ¶ 6).[3] As a result, AT&T's HR department launched an investigation on April 28, 2015. (Doc.

---

[2] The nine particular dates are: February 19, 2015 (8.50 hours); February 24, 2015 (8.50 hours); March 3, 2015 (5.35 hours); March 4, 2015 (8 hours); March 10, 2015 (8 hours); March 19, 2015 (4.68 hours); April 9, 2015 (7.40 hours); April 10, 2015 (8.50 hours); and April 16, 2015 (7 hours). (Doc. 36-2, Ex. 7 at 21–23, 26, 62, 70, 73); (Doc. 36-6, ¶ 15).

[3] Contrary to the allegations in the Complaint, Vonderhaar testified that she did not initially report the incident to Waymire but may have discussed it with her at a later date. (Doc. 38-5 at 74). In addition, Vonderhaar did not address her concerns to any public agency. (Doc. 38-5 at 79).

36-7, ¶ 6). After Eaves and the accused co-worker were interviewed, it was concluded that the allegations were unsubstantiated. *Id.*; (Doc. 36-4, ¶ 12).[4]

### B. Vonderhaar's Workplace Conduct

Vonderhaar, like other AT&T employees, received regular training on AT&T's Code of Business Conduct ("COBC") and was aware of her obligation to treat others professionally and respectfully in the workplace. (Doc. 38-6 at 35–36). AT&T also maintained a progressive discipline and attendance policy. Under AT&T's Attendance Guidelines, infractions were assigned a point value in ¼ increments depending on the degree of tardiness, ranging from ¼ to 1 full point. (Doc. 36-5, Ex. 1 at 118).[5] Discipline was carried out by issuing the employee: a Counseling Notice at 4 points; a Written Warning at 5 points; a Final Written Warning at 6 points; and Termination at 7 points. *Id.* However, 180 days after an attendance infraction, the associated point value is extinguished. *Id.*

On February 16, 2015, Vonderhaar received a Counseling Notice for four unexcused absences. (Doc. 38-8 at 10). A Written Warning was sent to Vonderhaar on March 6, 2015, after an additional unexcused absence. *Id.* at 13.

---

[4] The investigation was closed on August 3, 2015. By that time, Vonderhaar was no longer employed by AT&T. (Doc. 36-4, ¶ 12). The investigation report concluded that the accused co-worker "was following up with the customer and making the situation right since the order cancelled in the system and she was unreserving the equipment and following up with the equipment so it would be ready when the customer arrived." (Doc. 38-13 at 3).

[5] The scale is as follows: (1–5 minutes) grace period; (6–15 minutes) ¼ point; (16–30 minutes) ½ point; (31 to 120 minutes) ¾ point; (120 minutes or more) 1 point; (one full day) 1 point. (Doc. 36-5, Ex. 1 at 118).

But attendance was not the only issue. On March 25, 2015, Vonderhaar's store manager at the time, Hoskins, reported an incident to AT&T's HR department, in which Vonderhaar was reported to have yelled and directed profanity toward another co-worker. (Doc. 36-5, ¶ 9); (Doc. 38-12 at 2–3). Vonderhaar was never disciplined for this incident. (Doc. 36-5, ¶¶ 9–10).

Shortly thereafter, on March 27, 2015, Hoskins was informed that Vonderhaar had again used profanity with two different co-workers in a conversation about the company's new attendance policy. *Id.* at ¶¶ 9, 10. Vonderhaar does not recall this incident. (Doc. 38-5 at 93). It is undisputed, however, that Hoskins met with Vonderhaar. According to Hoskins, he discussed the incident with Vonderhaar, reminded her of appropriate workplace behavior, and documented the conversation. (Doc. 36-5, ¶ 10); (Doc. 38-4 at 1). Vonderhaar recalls differently, and claims she was "singled out" by Hoskins to discuss the new attendance policy because she was concerned about how it would affect her FMLA. (Doc. 38-5 at 93, 155). Vonderhaar alleges that in that meeting, Hoskins told her "not to worry about [the new attendance policy], we'll cross that bridge when we get there. Don't worry about the FMLA, [and] how that will affect you." *Id.* at 93, 154–55. In either event, Vonderhaar was not disciplined for this incident. *Id.* That same day (March 27), Vonderhaar states she experienced a panic attack at work and Eaves drove her to the hospital. (Doc. 38-5 at 94). She was prescribed anxiety medication and released the same day. *Id.* at 94, 161.[6]

---

[6] Since April 2015, Vonderhaar testifies: (i) she has been taking 2 milligrams of an anxiety medication, Ativan, "as needed or twice a day," (Doc. 38-5 at 162); (ii) she has suffered one or two panic attacks, which did not result in hospitalization, *id.* at 163–64; and (iii) she

On April 16, 2015, Vonderhaar received a Final Written Warning for having accrued a total of six unexcused absences between November 15, 2014 and April 2, 2015. (Doc. 38-8 at 16). The next day, Waymire met with Vonderhaar, Hoskins, and Eaves. In the meeting, Vonderhaar recalls her managers repeatedly asking, "what was going on" and whether she was "having issues" or "problems." (Doc. 38-5 at 100). In addition, Vonderhaar alleges she was told that she was "resentful to the company," her "hormones were not in check," and that she should take an unpaid leave-of-absence so that she did not lose her job. (Doc. 38-5 at 99–101); (Doc. 1-1, ¶ 13). When Vonderhaar refused because she could not afford to go without a paycheck, Waymire allegedly suggested she take the leave-of-absence in the form of FMLA leave and short-term disability in order to cover her wages. (Doc. 38-5 at 100). Vonderhaar eventually agreed and that day took 4.82 hours of intermittent FMLA leave. (Doc. 36-2, Ex. 7 at 74).

Thereafter, Vonderhaar took continuous FMLA leave from April 21, 2015 to May 27, 2015. (Doc. 36-6, ¶ 17); (*see* Doc. 1-1, ¶ 15).[7] In addition, Vonderhaar received short-term disability benefits from April 28, 2015 to May 27, 2015. (Doc. 36-6, ¶ 17). While on leave, Vonderhaar phoned AT&T's Ethics Hotline on May 21, 2015, and reported that Waymire had

---

does not experience anxiety symptoms every day. *Id.* Insofar as treatment goes, Vonderhaar visits Dr. Carmen Woolums, a family practice physician, once every three months to follow-up on the dosage and effectiveness of the anxiety medication. *Id.* at 182.

[7] Vonderhaar's physician submitted a medical certification, stating that intermittent leave was medically necessary from March 27, 2015 to April 22, 2015. (Doc. 38-5 at 117–18); (Doc. 36-6, Ex. 3).

forced her to take a leave of absence in retaliation for reporting the unauthorized changes to customer accounts. (Doc. 38-5 at 122–23). An investigation was conducted by AT&T's HR department and was eventually closed when Vonderhaar's allegations of retaliation and violations of company policy could not be substantiated. (Doc. 36-8, ¶¶ 4–5).[8]

When Vonderhaar returned to work, she was reinstated to her previous position, performing the same job duties and earning the same salary. (Doc. 38-5 at 119). At this time, Vonderhaar alleges she witnessed multiple instances where her co-workers added the cost of insurance to customer accounts without authorization. (Doc. 1-1, ¶ 15). Vonderhaar testified that she informed Waymire and Hoskins that "fraud was still being committed on the accounts" but never stated the specifics of the alleged misconduct. (Doc. 38-5 at 82–84). Indeed, Vonderhaar admits that she never filed a complaint via the Ethics Hotline; nor did she contact a public agency to report that insurance charges were being added without authorization. *Id.* at 84–85.

After returning from her "forced" FMLA leave of absence, Vonderhaar admits that she was never denied FMLA leave. (Doc. 38-5 at 121). In fact, Vonderhaar requested and was approved to take 5.7 hours of FMLA leave on May 30, 2015, and 8 hours of FMLA leave on June 5, 2015. (Doc. 36-2, Ex. 7 at 63, 87).

Vonderhaar avers that after she returned to work at the end of May 2015, she "was

---

[8] The investigation was closed on July 9, 2015, at which time Vonderhaar was no longer employed by AT&T. (Doc. 36-8, ¶ 5). Nonetheless, the individual assigned to the case informed Vonderhaar that the investigation was complete. *Id.*

being treated different." (Doc. 38-5 at 143–44). In particular, Vonderhaar claims that: (1) she was "verbally attacked by a customer in the middle of the sales floor" and Hoskins failed to intervene, (Doc. 38-5 at 139–41); (2) she was not receiving "coaching sessions" from Hoskins and was not informed of her sales goal for the portion of May 2015 when she returned from her FMLA leave, *id.* at 141, 150; and (3) she felt like Waymire was indifferent toward her and would ignore her and "not even make eye contact." *Id.* at 142–43.[9] On the other hand, Vonderhaar also testified that when she returned to work: she was never demoted; her job responsibilities were never reduced; she received the same salary; and management never told her she was being terminated. *Id.* at 119, 139, 148–149. Nevertheless, on June 10, 2015, Vonderhaar sent an e-mail to Waymire and others, informing them she was resigning, effective June 24, 2015. (Doc. 38-15). The reason for her decision, she explained, is that:

> [C]ertain individuals have been allowed to cross certain boundaries that the rest of the staff and myself would never dare cross resulting in fraud to be perpetrated on customer accounts with no repercussions . . . . Since my return I don't feel welcome by certain members of management and feel it best if I step down.

*Id.* Vonderhaar then exhausted vacation time from June 11 through June 24, 2015, when her resignation became effective. (Doc. 36-5, ¶ 18). According to Vonderhaar's own testimony, all of her requests for FMLA leave over the course of her employment with AT&T were

---

[9] But contrary to Vonderhaar's averments, AT&T's sales consultants can access their up-to-date sales goals and metrics on a daily basis through the company's intranet system. Moreover, unless an employee is on an active step of discipline for job performance, managers at AT&T are not required to conduct coaching sessions on a daily basis. (Doc. 36-5, ¶¶ 13–14). When Vonderhaar returned from FMLA leave in May 2015, she was not on an active step of performance discipline. *Id.* at ¶ 15.

approved. (Doc. 38-5 at 52, 121). In fact, when she resigned from her position, Vonderharr had 3.52 hours of FMLA leave remaining. (Doc. 38-10 at 10).

Nearly two years after resigning, Vonderhaar brought this lawsuit alleging violations of the FMLA, 29 U.S.C. §§ 2601 *et seq.*, and that she had been constructively discharged.

## LEGAL STANDARD

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). "A *genuine* issue of *material* fact exists when, 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir. 2010) (emphasis added) (quoting *Anderson*, 477 U.S. at 249). When the issue is a "pure question of law," extraneous facts that do not bear on that question are "immaterial." *See, e.g., Chappell v. City of Cleveland*, 585 F.3d 901, 909–914 (6th Cir. 2009) (citing *Scott*, 550 U.S. at 381 n.8).

## ANALYSIS

## I.    FMLA CLAIMS (COUNTS I & II)

### A.    Procedural Defects In Vonderhaar's Response Brief

Before turning to the merits of Vonderhaar's averments, the Court will address the allegations and theories of recovery concerning Vonderharr's FMLA claims that are properly

before this Court for consideration.

Pursuant to 29 U.S.C. § 2615(a)(1), Vonderhaar asserts an FMLA interference claim in Count I, alleging that she was denied FMLA benefits because Defendants "forc[ed]" her "to take FMLA leave" on April 17, 2017, "in retaliation for her failure and/or refusal to violate the law . . . thus depleting [her] FMLA entitlement." (Doc. 1-1, ¶¶ 14, 26). In Count II, Vonderhaar asserts that Defendants "retaliated" against her "by constructively terminating her from her position because she exercised her rights under the FMLA" in violation of 29 U.S.C. § 2615(a)(2). (Doc. 1-1, ¶ 32). However, Vonderhaar unequivocally testified at deposition that all of her requests for FMLA leave time were approved by AT&T. (Doc. 38-5 at 52, 121). Yet Vonderhaar claims otherwise in her brief in response to Defendants' motion for summary judgment.

Vonderhaar's last-ditch effort to stave off summary judgment is unavailing. It is well established that:

> [I]f the party opposing the motion disagrees with the movant's characterization of material facts as undisputed the opposing party may address the movant's factual contentions *only by*: [1] Citing to particular parts of the record . . . ; or [2] "Showing" that the materials cited by the movant do not establish the absence of a genuine dispute.

11 James W. Moore et al., MOORE'S FEDERAL PRACTICE § 56.81(2) (Matthew Bender 3d ed. 2018) (emphasis added) [hereinafter "MOORE'S"]; Fed. R. Civ. P. 56(c)(1). Merely "making bald assertions in a legal memorandum . . . will not enable the nonmovant to withstand a properly supported summary judgment motion." *Id.* § 56.41(1) (citing *Morrison v. Bd. of Educ.*, 521 F.3d 602, 620 (6th Cir. 2008)).

The problem here is that Vonderhaar has failed to properly oppose Defendants' motion with evidence in the record. Instead, Vonderhaar has effectively attempted to amend her Complaint in her response brief by asserting new facts and theories that blatantly contradict her own deposition testimony. Specifically, she alleges she was denied FMLA leave on February 4, February 11, and February 19, 2015. *See* (Doc. 38 at 16). But Vonderhaar's theory is flawed for two reasons: (1) the allegations are not found in the Complaint; and (2) the claim is not supported by evidence in the record.

First, it is a cardinal rule that "a plaintiff may not expand [her] claims to assert new theories for the first time in response to a summary judgment motion." *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 667 (6th Cir. 2012) (citing *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)); *see also Tucker v. Union of Needletrades, Indus. and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (holding that a plaintiff may not raise a new legal claim in response to summary judgment). Indeed, the Sixth Circuit recently reiterated this very principle. *Alexander v. Carter*, 733 F. App'x 256, 265 (6th Cir. 2018). To permit otherwise would subject Defendants to "unfair surprise." *Id.*; *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013) (citation omitted). That is because "by this point a plaintiff has had the opportunity to . . . amend the complaint to reflect new theories." *Desparois*, 455 F. App'x at 666.

Here, Vonderhaar has improperly raised theories of recovery for the first time. The rule prohibiting this tactic is especially applicable in this case because the Complaint only vaguely mentions in passing that "Defendants denied [Vonderhaar] FMLA benefits" when

they "forc[ed] [Vonderhaar] to take FMLA leave." (Doc. 1-1, ¶26). And in her deposition, Vonderhaar testified that *all of her* FMLA requests "were approved" and that Defendants were simply defending an "involuntary" FMLA leave claim. (Doc. 38-5 at 52, 121). Therefore, Vonderhaar cannot now pursue a claim for the denial of FMLA benefits under 29 U.S.C. § 2615(a)(1).

Second, Vonderhaar cannot sustain a claim for the denial of FMLA benefits because she has not adduced any evidence that she requested and was entitled to FMLA leave for the three dates in February 2015. (Doc. 38 at 16). "To be entitled to FMLA leave, an employee must both notify [their] employer of [the] need to take leave and state a qualifying reason for leave." *Levaine v. Tower Auto. Operations USA I, LLC*, 680 F. App'x 390, 393 (6th Cir. 2017) (denying FMLA claim where employee merely believed he was entitled to FMLA leave for a particular date that he received a disciplinary write-up); 29 C.F.R. § 825.301(b); *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (stating elements of FMLA interference claim).

Here, the recently contrived contentions Vonderhaar raises in her response brief are bereft of any citation to record evidence. *See* (Doc. 38. at 15–25). Rather, Vonderhaar simply asserts that she was denied FMLA leave on February 4, 11, and 19. (Doc. 38 at 16). A review of the record, however, reveals there is no medical certification, e-mail, or request form before the Court concerning these dates. *Festerman v. Cty. of Wayne*, 611 F. App'x 310, 315 (6th Cir. 2015) (stating that "merely 'calling in sick' is insufficient to trigger any obligation of the employer under the FMLA."). In fact, Vonderhaar's FMLA leave documents plainly demonstrate that her absence on February 19, 2015, was later approved as FMLA leave and

removed from her discipline record *before* she was issued her Final Written Warning. (Doc. 38-10 at 7; Doc. 38-8 at 16). The record is simply devoid of any evidence to support the notion that Vonderhaar was denied FMLA leave. Thus, the factual contentions Vonderhaar has raised for the first time at this stage are not properly before the Court and will not be considered. Consequently, where appropriate, the Court will consider the facts asserted by Defendants as "undisputed for purposes of the motion." 11 MOORE'S § 56.81(2) (citing Fed. R. Civ. P. 56(e)(2)); *id.* at § 56.99(2)(b)).

Therefore, the only issues pertaining to Vonderhaar's FMLA claims are (i) whether she has stated an FMLA claim under an "involuntary-leave" theory; and (ii) whether she was retaliated against for exercising her FMLA rights.

### B. Vonderhaar's FMLA Interference Claim (Count I) Fails to Satisfy the "Involuntary-Leave" Theory of Recovery.

In light of the above conclusion, the sole premise of Vonderhaar's interference claim is that she was "involuntarily" placed on FMLA leave. (Doc. 1-1, ¶ 14). The Sixth Circuit has recognized that an "involuntary-leave" claim is actionable under 29 U.S.C. § 2615(a)(1), where "an employer forces an employee to take FMLA leave when the employee does not have a 'serious health condition' that precludes her from working." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007) (quoting *Hicks v. LeRoy's Jewelers, Inc.*, No. 98-6596, 2000 U.S. App. LEXIS 17568, 2000 WL 1033029, at *3–4 (6th Cir. July 17, 2000) (unpublished), *cert. denied*, 531 U.S. 1146 (2001)). But there is one caveat. An involuntary-leave claim "ripens *only* when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past." *Id.*

*Vonderhaar v. AT&T Mobility Servs., LLC* et al.

(emphasis added).

Here, Vonderhaar alleges that she was forced to take FMLA leave on April 17, 2015, and took continuous FMLA leave from April 21 to May 27, 2015. (Doc. 1-1, ¶¶ 13–15; Doc. 38-5 at 100); *see also* (Doc. 36-6, ¶ 17). "But this, in itself, does not create a ripe, involuntary-leave claim." *Wysong*, 503 F.3d at 450. Vonderhaar "would have had to allege also that she later requested FMLA leave, but that [AT&T] refused, based on the fact that she had already used up her available FMLA leave." *Id.* That allegation is absent from Vonderhaar's Complaint and is otherwise unsupported by the evidence in the record.

The linchpin on summary judgment, however, is the undisputed fact that when Vonderhaar resigned she had 3.52 hours of FMLA leave remaining. (Doc. 38-10 at 10). Before that, Vonderhaar had returned to work at the end of May 2015 after allegedly being forced to take FMLA leave. She then requested, was approved, and took 5.7 hours of FMLA leave on May 30, 2015, and 8 hours of FMLA leave on June 5, 2015. (Doc. 36-2, Ex. 7 at 63, 87), leaving 3.52 hours of FMLA leave unused. (Doc. 38-10 at 10). As such, Vonderhaar was never unable to take FMLA leave because she had previously been forced to expend her FMLA allotment. *Wysong*, 503 F.3d at 449.

Therefore, as a matter of law, Vonderhaar's involuntary-leave claim fails. *See, e.g., Id.* at 450; *Monroe v. Consumers Energy*, No. 18-1006, 2018 U.S. App. LEXIS 27887, at *6 (6th Cir. Oct. 1, 2018) (plaintiff failed to state a claim under the FMLA because she did "not allege that she was unable to take leave because defendant had previously required her to use up her leave"); *Huffman v. Speedway LLC*, 621 F. App'x 792, 797 (6th Cir. 2015) (plaintiff "never

requested FMLA leave and so her involuntary-leave claim remain[ed] unripe."); *Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 488 (6th Cir. 2013) (same).

### C. Vonderhaar was Not Subjected to an Adverse Employment Action as a Consequence for Taking FMLA Leave, and Therefore Vonderhaar's Retaliation Claim (Count II) Fails.

In Count II, Vonderhaar claims she was retaliated against because she went on FMLA leave. (Doc. 1-1, ¶ 32). Because Vonderhaar relies on indirect evidence to establish a causal connection between the protected activity and any adverse employment action, the familiar *McDonnell Douglas* burden-shifting framework is applied, under which Vonderhaar must first state a prima facie case of retaliation. *Donald*, 667 F.3d at 761–62; *Edgar v. JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2006). To state a prima facie case of retaliation under 29 U.S.C. § 2615(a)(2) of the FMLA, Vonderhaar must establish that:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald*, 667 F.3d at 761. Vonderhaar has failed to state a prima facie case because she has not shown that she suffered an adverse employment action.

Vonderhaar does not argue that she was terminated. Instead, Vonderhaar asserts that AT&T retaliated against her by "constructively terminating her from her position because she exercised her rights under the FMLA." (Doc. 1-1, ¶ 36).

"Constructive discharge is hard to prove." *Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 630 (6th Cir. 2018). The employee must demonstrate that (1) "her working conditions

were objectively intolerable"; and (2) "her employer deliberately created those conditions in hopes that they would force her to quit." *Id.* However, "[t]he employee has an obligation not to assume the worst, and not to jump to conclusions too fast." *McDonald v. UAW-GM Ctr. for Human Res.*, 738 F. App'x 848, 856 (6th Cir. 2018) (citation omitted)).

As to the first element, "working conditions are objectively intolerable where 'a reasonable person in the plaintiff's shoes would feel compelled to resign.'" *Festerman v. Cty. of Wayne*, 611 F. App'x 310, 319–20 (6th Cir. 2015). To determine whether a reasonable person would have felt compelled to resign, the Sixth Circuit considers the following factors "singly or in combination":

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a [male] supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Russell v. CSK Auto Corp.*, 739 F. App'x 785, 794 (6th Cir. 2018); *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005). Here, each time Vonderhaar returned from FMLA leave, she admits that she was reinstated to the same previous position, performed her usual duties, earned the same salary, and she was never demoted. (Doc. 38-5, Pl.'s Dep. at 115, 119, 148–49).[10] In addition, it remains undisputed that Vonderhaar returned to work under the same supervisor, Hoskins. (Doc. 36-5, ¶ 17). As such, Vonderhaar

---

[10] Any retaliation that Vonderhaar alleges she was the victim of as a result of reporting her co-workings for fraudulent activity is, of course, not a "protected activity" under the FMLA, and therefore is irrelevant to Vonderhaar's FMLA retaliation claim.

has failed to show that she was constructively discharged.

Although Vonderhaar believes otherwise and "submits that she suffered a reduction in salary, reduction in job responsibilities, [and] reassignment to different work," (Doc. 38 at 21), this conclusory statement is made without a citation to the record and directly contradicts her own deposition testimony. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, Vonderhaar's naked proffer is insufficient to defeat summary judgment.

Vonderhaar, however, contends there are four additional facts that show that she was constructively discharged. The law holds otherwise.

First, Vonderhaar avers that Hoskins failed to intervene when she was "verbally attacked by a customer in the middle of the sales floor." (Doc. 38-5 at 139–41). But this is merely an isolated incident involving the actions of a third-party, and therefore does not amount to constructive discharge. *See Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 708 (6th Cir. 2012).

Second, Vonderhaar maintains she did not receive "coaching sessions" from Hoskins and was not informed of her sales goal for the portion of May 2015 when she returned from FMLA leave. (Doc. 38-5 at 141, 150). To constitute an adverse employment action, the act of an employer failing to train an employee must result in "a deprivation of increased compensation," *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 710 (6th Cir. 2007), or being

"passed up for promotions." *Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 345 (6th Cir. 2008).

Here, there is no evidence that Vonderhaar was deprived of the opportunity to serve in a position with a higher pay rate as a result of allegedly not receiving "coaching sessions." *See Clay*, 501 F.3d at 710. Moreover, the record demonstrates that Vonderhaar was treated no differently than other similarly situated employees.

In other words, Vonderhaar has presented no evidence to refute the fact that: (a) managers provide "coaching sessions" only for those employees on "an active step of discipline for job performance," which Vonderhaar was not, (Doc. 36-5, ¶¶ 14–15); and (b) all of AT&T's sales consultants are able to access their sales goals and metrics on a *daily basis* via the company's intranet system. *Id.* at ¶ 13. Thus, Vonderhaar was not constructively discharged simply because she did not receive "coaching sessions."

Next, Vonderhaar states that she felt like Waymire was indifferent toward her and would ignore her and "not even make eye contact." (Doc. 38-5 at 142–43). But "[h]urt feelings," without more, is insufficient to constitute intolerable working conditions. *Festerman*, 611 F. App'x at 320.

Finally, Vonderhaar alleges she was subjected to "badgering/harassment/ humiliation by her employer regarding her hysterectomy." *See* (Doc. 38 at 20–21). Putting aside the conclusory nature of the statement, the only "harassment" that can presumably be gleaned from the record is again an isolated incident that Vonderhaar testified occurred in a meeting, in which Vonderhaar's managers allegedly told her that her "hormones were not in

check." (Doc. 38-5 at 99–101); (Doc. 1-1, ¶ 13). This "fleeting" comment, as opposed to remarks that span the course of Vonderhaar's employment, cannot form the basis of a colorable FMLA retaliation claim even if the comment was construed to be related to the "exercise of her FMLA-protected rights." *Weigold v. ABC Appliance Co.*, 105 F. App'x 702, 709 (6th Cir. 2004); *Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004) (calling an employee "incompetent" and a "whiner" in front of other employees is, by itself, insufficient to establish constructive discharge); *Cleveland*, 491 F. App'x at 708 ("[D]isparaging comments . . . isolated to only a few incidents and by a few individuals" is "not pervasive enough to significantly alter [an employee's] working conditions.").

Indeed, the Sixth Circuit recently concluded that a defendant-employer was entitled to summary judgment despite that plaintiff's manager had made comments to plaintiff over the course of three to four months "degrading her and calling her stupid during their daily coaching sessions"; "telling her that everyone in the office hated her and did not want her there"; and "that she needed to seek psychological help and seek help from the employee assistance program." *Brister v. Mich. Bell Tel. Co.*, 705 F. App'x 356, 360 (6th Cir. 2017).

Viewed against this backdrop, Vonderhaar's constructive discharge allegations pale in comparison.[11] Vonderhaar's work environment may have been less than ideal, but

---

[11] Even assuming *arguendo* that any of the allegations constitute an adverse employment action, there is no evidence Defendants acted "specifically *because* [Vonderhaar] invoked [her] FMLA rights." *Levaine v. Tower Auto. Operations USA I, LLC*, 680 F. App'x 390, 393 (6th Cir. 2017) (emphasis in original) (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)). The fact that Defendants allegedly forced Vonderhaar to take FMLA leave undermines any result to the contrary.

contrary to her perception it cannot be said that "the handwriting was on the wall and the axe was about to fall" such that resignation was a fitting response. *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014) (quoting *EEOC v. Univ. of Chicago Hosp.*, 276 F.3d 326, 332 (7th Cir. 2002) (internal quotations and citation omitted)).

Vonderhaar's employment conditions, taken together or in isolation, as a matter of law fall short of the "intolerable working conditions" that would cause a reasonable person to feel compelled to resign. She, therefore, has failed to establish an adverse employment action.

## II.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT III)

At the heart of an intentional infliction of emotional distress claim, there must be conduct by the wrongdoer that is outrageous and intolerable such that it offends generally accepted standards of decency and morality. *Andrew v. Begley*, 203 S.W.3d 165, 173 (Ky. Ct. App. 2006) (citing *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996)).[12] "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 806 (6th Cir. 1994) (quoting Restatement (Second) of Torts § 46 cmt. n.(h) (1965)); *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788–89 (Ky. 2004). To that

---

[12] In particular, a plaintiff must establish the following four elements: (1) the defendant's conduct was "intentional or reckless"; (2) the conduct was "outrageous and intolerable" such that "it offends generally accepted standards of decency and morality"; (3) there is a "causal connection between the wrongdoer's conduct and the emotional distress"; and (4) the emotional distress caused was "severe." *Willgruber*, 920 S.W.2d at 65 (quoting *Craft*, 671 S.W.2d at 249).

end, the conduct at issue must transcend "all reasonable bounds of decency" and be considered "utterly intolerable in a civilized community." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d at 791 (quoting *Craft v. Rice*, 671 S.W.2d 247, 250 (Ky. 1984)).

The law simply does not compensate a victim of conduct that involves "petty insults, unkind words and minor indignities" or that is merely "cold, callous and lacking sensitivity." *Osborne v. Payne*, 31 S.W.3d 911, 914 (Ky. 2000).

Here, the same salient facts outlined under Vonderhaar's retaliation claim are relevant. As such, because Vonderhaar's working conditions were not "objectively intolerable," it follows that Defendants' alleged actions cannot be deemed "utterly intolerable in a civilized community."[13]

The alleged behavior in this case involves, at most, "an isolated insult," *Meade v. AT&T Corp.*, 657 F. App'x 391, 398 (6th Cir. 2016), or the loss of employment and resulting emotional distress, *Miracle v. Bell Cty. Emergency Med. Servs.*, 237 S.W.3d 555, 560 (Ky. 2007). But such conduct does not support a claim for IIED. *See also Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 385 (6th Cir. 2017) (holding that "[m]aking a snide remark about taking leave, telling an employee she is not doing her job effectively during a demotion meeting, and creating an awkward situation at lunch" does not rise to the level of extreme and outrageous conduct).

Vonderhaar's IIED claim also fails because she has not shown that her emotional

---

[13] Vonderhaar misrepresents her sworn deposition testimony in contending otherwise. *Compare* (Doc. 38 at 21, 24), *with* (Doc. 38-5, Pl.'s Dep. at 115, 119, 148–49).

injury qualifies as "serious" or "severe." An emotional injury qualifies as "serious" or "severe" where:

> A reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case. Distress that does not significantly affect the plaintiff's everyday life or require significant treatment will not suffice. And a plaintiff claiming emotional distress damages must present expert medical or scientific proof to support the claimed injury or impairment.

*Osborne*, 399 S.W.3d at 17 (internal citations and footnotes omitted).

It is readily apparent that Vonderhaar has not experienced emotional distress that rises to the requisite level of severity needed to sustain an IIED claim. In particular, Vonderhaar candidly admits that: (i) she has only had "one or two" panic attacks since the first incident in March 2015; (ii) she takes medication only "as needed or twice a day"; (iii) she visits her family physician, at most, only "once every three months"; and (iv) she experiences sporadic symptoms "depend[ing] on what's going on." (Doc. 38-5 at 162–65, 182).

Moreover, Vonderhaar has presented only her own assertions to support her alleged emotional distress. *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 544 (Ky. Ct. App. 2013) (affirming summary judgment in favor of defendants because plaintiffs "presented only their own statements that [they] suffered severe emotional distress"). As such, Vonderhaar's claimed injury does not meet the standard for "serious or severe" emotional distress.

## III.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (COUNT IV)

To establish a claim for negligent infliction of emotional distress ("NIED"), a plaintiff

must first establish the general elements of negligence: (1) duty; (2) breach; (3) injury; and (4) legal causation between the defendant's breach and the plaintiff's injury. *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012). As with IIED, however, an NIED claim also requires a showing of serious or severe emotional distress. *Crook v. Maguire*, No. 2015-CA-000379-MR, 2018 Ky. App. LEXIS 133, at *4 (Ky. Ct. App. May 11, 2018) (citing *Osborne*, 399 S.W.3d at 17)). For the same reasons stated above, it is this requirement that Vonderhaar fails to meet.

## IV. WRONGFUL-TERMINATION (COUNT VI)

The last substantive Count in the complaint is Vonderhaar's wrongful-termination claim, which is premised on a constructive discharge theory. Under Kentucky law, it is well established that an employer may terminate an employee "for good cause, for no cause, or for a cause that some might view as morally indefensible." *Smith v. LHC Grp., Inc.*, 727 F. App'x 100, 106 (6th Cir. 2018) (quoting *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983)). A cause of action exists, however, under a "narrow public policy exception" that applies in only three circumstances:

> (1) where there are "explicit legislative statements prohibiting the discharge," (2) where "the alleged reason for the discharge . . . was the employee's failure or refusal to violate a law in the course of employment," or (3) when "the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment."

*Mitchell v. Univ. of Ky.*, 366 S.W.3d 895, 898 (Ky. 2012) (quoting *Hill v. Ky. Lottery Corp.,* 327 S.W.3d 412, 422 (Ky. 2010)).

Here, Vonderhaar's claim arises under the second situation. That is, Vonderhaar asserts that she was "constructively discharged for her failure and/or refusal to violate"

various State and federal laws or otherwise remain "complicit with fraud." (Doc. 1-1, ¶ 46; Doc. 38-5 at 143, 147).[14] Vonderhaar's theory fails.

In limited circumstances, requiring an employee "to engage in activity she considers illegal and immoral" may create intolerable working conditions sufficient to sustain allegations of constructive discharge. *Smith v. LHC Grp., Inc.*, 727 F. App'x 100, 104 (6th Cir. 2018). But in contrast to *Smith*, AT&T did not "ignore[] [Vonderhaar]'s complaints of illegal activity." *Id.* Rather, a thorough investigation was conducted after each of her reports and the allegations were found to be unsubstantiated. (Doc. 36-4, ¶ 12; Doc. 36-8, ¶¶ 4–5).

And most significantly, Vonderhaar, unlike *Smith*, was *not* required to make unauthorized changes to customer accounts "or otherwise [become] entangled in her coworkers' failure to [adhere to company policy]" by virtue of her position as a retail sales floor associate. *Smith*, 727 F. App'x at 104*.* As such, the conduct of Vonderhaar's co-workers has no impact on her working conditions in this case, and her wrongful-termination claim therefore fails.

To be sure, Vonderhaar's claim falters because the basis for her claim does not fit within the applicable "well-defined public policy" exception. *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985).[15]A plaintiff can satisfy the relevant public policy exception: (i) where an

---

[14] The specific laws allegedly at issue are: (a) the Communications Act of 1934, 42 U.S.C. §§ 151 *et seq.*; (b) Truth-in-Billing Requirements, 47 C.F.R. § 64.2401; (c) KRS §§ 278.535, .542 (switching of telecommunications provider); (d) KRS §§ 514.010 *et seq.* (theft); §§ 516.010 *et seq.* (forgery); (e) KRS § 464.010 *et seq.* (nonexistent); and (f) the Kentucky Consumer Protection Act, KRS § 367.120 *et seq.* (*See.* Doc. 1-1, ¶ 45).

[15] "The decision of whether the public policy asserted meets these criteria is a question of

"employer affirmatively requests that the employee violate the law"; or (ii) "when an employee learns of illegal activity and, although not directly invited to participate by his employer, knows he will inevitably become complicit in the illegality by performing his normal work responsibilities." *Alexander v. Eagle Mfg. Co., LLC*, 714 F. App'x 504, 509 (6th Cir. 2017); *Smith*, 727 F. App'x at 108. In *Alexander* the plaintiff was terminated outright for "discovering and reporting" illegal conduct. *See id.* at 506. On appeal, he maintained he would become complicit in unlawful activity by signing off on engine blocks he knew were defective, a practice he witnessed, objected to, and refused to follow. *Id.* at 508–09.

In this case, Vonderhaar testified that she was never asked by her managers to: (1) sign a contract for a customer without the customer being present at the store, (Doc. 38-5 at 79, 69); (2) add the cost of insurance to customer accounts without informing the customer, *id.* at 83–84; or (3) "violate the law in any way." *Id.* at 86. Instead, the basis for her claim is that she became aware of assistant manager Eaves discounting a transaction for a co-worker who, while speaking to a customer over the phone, had signed a two-year agreement in the customer's name and added a line of service to an electronic device that Vonderhaar had originally sold. (Doc. 38-5 at 57, 70–72; Doc. 38-13 at 13).

As a result, Vonderhaar brought the information to assistant manager Eaves' attention and then later reported the incident via AT&T's anonymous Ethics Hotline. *Id.* at 74; (Doc. 38-13, Rep. & Investigation at 7, 10). Vonderhaar reasons that by refusing to remain

---

law for the court to decide, not a question of fact." *Grzyb*, 700 S.W.2d at 401.

"complicit in another employee's forging of a customer's signature . . . she set off a chain of events that culminated in her constructive discharge." (Doc. 38 at 22).

The defect in Vonderhaar's theory, as in *Alexander*, is that it is not evident from this isolated incident that she "would have inevitably been forced to participate or become complicit in any illegal activity." 714 F. App'x at 509. Even if Vonderhaar were the sole sales consultant at her store location, and unauthorized changes to customer accounts were "systematic," it would be "unreasonable to infer" that somehow Vonderhaar was complicit simply because the fraudulent activity involved a customer with whom Vonderhaar previously had dealings. *Id.*

Thus, like *Alexander*, "although [her] coworkers may have been engaging in illegal activity, [Vonderhaar, herself], was never affirmatively asked to violate the law, nor did [her] position make it inevitable that she would be forced to do so." *Id.* Simply put, the conduct of Vonderhaar's co-workers is separate and apart from her job responsibilities.

Therefore, Kentucky's public policy exception to the employment-at-will doctrine does not embrace Vonderhaar's claim, and therefore Vonderhaar has failed to show that she was constructively discharged.[16]

## V. VICARIOUS LIABILITY/NEGLIGENCE (COUNT V), PUNITIVE DAMAGES (COUNT VII), AND CAUSATION AND DAMAGES (COUNT VIII), ARE NOT INDEPENDENT CAUSES OF ACTION.

---

[16] Vonderhaar also lacks a right of action under Kentucky's whistleblower statute because that provision only covers public employees, *see* KRS § 61.102, and the protection has not been extended to private employees. *See Beach v. ResCare, Inc.*, No. 2004-CA-002559-MR, 2005 WL 2174404, at *3 (Ky. Ct. App. Sept. 9, 2005).

In Count V, Vonderhaar asserts a claim for vicarious liability based on the negligence of Defendants' agents. But the doctrine of "*respondeat superior* is not a cause of action. It is a basis for holding the [Defendant] responsible for the acts of its agents." *O'Bryan v. Holy See*, 556 F.3d 361, 370 n.1, 383 (6th Cir. 2009). Therefore, Count V is dismissed.

Count VII sets forth a claim for punitive damages. Again, "a claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action." *PNC Bank, N.A. v. Merenbloom*, Nos. 15-6361, 16-5277, 2017 WL 3973962, at *3 (6th Cir. June 16, 2017) (citation omitted) (applying Kentucky law); *see also Horton v. Union Light, Heat, & Power Co.*, 690 S.W.2d 382, 389 (Ky. 1985). In opposition, Vonderhaar cites to *Chelsey v. Abbott*, 524 S.W.3d 471 (Ky. Ct. App. 2017). But *Chelsey* is easily distinguishable because that case involved a specific Kentucky statute that "treat[ed] punitive damages as a 'claim.'" *Id.* at 481–82. Accordingly, Count VII is dismissed.

Finally, causation is merely an element of a common law negligence claim. *Osborne*, 399 S.W.3d at 17.

For the foregoing reasons, the Complaint in its entirety will be dismissed with prejudice.

## IV.    CONCLUSION

Having reviewed this matter, and the Court being advised,

**IT IS ORDERED** that:

(1) Defendants' motion for summary judgment (Doc. 36) be, and is hereby, **GRANTED;** and

*Vonderhaar v. AT&T Mobility Servs., LLC* et al.

(2) Plaintiff's claims be, and are hereby, **DISMISSED WITH PREJUDICE.**

A separate judgment shall enter concurrently herewith.

This 11th day of March 2019.



Signed By:

_**William O. Bertelsman**_

**United States District Judge**